UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re<br><br>TIMOTHY D. HAVENS,<br><br>　　　　　　　Debtor | Chapter 7<br>Case No. 16-12994-FJB |

MEMORANDUM OF DECISION ON
OBJECTION TO CONFIRMATION OF CHAPTER 13 PLAN

I. INTRODUCTION

Debtor Timothy Havens has filed a chapter 13 plan ("the Plan") that he would fund with monthly payments of $833.00 over a term of 36 months, a total of $29,980.19, and thereby pay, after administrative claims (the trustee's fee and $3,000 to his attorney), a total distribution to nonpriority unsecured creditors of $23,982.17. Filed nonpriority unsecured claims total $318,315.01. The vast majority of this debt is held by creditors Lawrence Lessard and Jennifer Meshna (together, "the Creditors"), who hold an allowed joint non-priority unsecured claim in the amount of $311,132.63.

The Creditors, through an original objection and a supplement to it [see docs. #28 and #155], have objected to confirmation of the Plan on the following grounds: (i) the applicable commitment period should be not 36 months but 60; (ii) the Plan does not devote all the Debtor's projected disposable income to repayment of his debt; (iii) the value of property to be distributed under the Plan to nonpriority unsecured creditors is less than they would receive in a liquidation under chapter 7 as of the effective date of the Plan; and (iv) the Debtor's filing of his bankruptcy petition was not in good faith. After a two–day evidentiary hearing, receipt of proposed findings and conclusions, and closing arguments, the Court now hereby enters its findings of fact and conclusions of law.

### II. JURISDICTION

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and the standing order of reference issued by the United States District Court for the District of Massachusetts. L.R. 201 (D. Mass.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(L) (core proceedings include confirmations of plans). Accordingly, under 28 U.S.C. § 157(b)(1), the Court has authority to enter final judgment in the matter.

### III. APPLICABLE COMMITMENT PERIOD

The debtor filed his petition for relief under Chapter 13 of the Bankruptcy Code on August 1, 2016. On August 29, 2018, the Debtor filed the chapter 13 plan now in issue; and, in support of it, he also filed Official Form 122C-1, the Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period ("Form 122C"). Form 122C calls for him to "Fill in the average monthly income that you received from all sources, derived during the 6 full months before you filed this bankruptcy case." On his Form 122C, the Debtor indicated that (i) he had "gross wages, salary, tips, bonuses, overtime, and commissions (before all payroll deductions)" of $250 (all sums purport to be average monthly totals), (ii) he had "amounts from any source which are regularly paid for household expenses of you or your dependents" of $1,482.15, and (iii) his wife had "net income from operating a business" of $5,668.09, bringing their total average monthly income to $7,400.24. After deduction of $2,765.90 of the wife's income as the portion thereof "that was NOT regularly paid for the household expenses of you or your dependents," the Debtor reported a current monthly income ("CMI") of $4,634.34, which, annualized, comes to $55,612.08. As $55,612.08 was less than the median annual income for a family of two in Massachusetts, $72,346.00, the Debtor was deemed to be a "below median debtor." As a consequence, his disposable income would not be determined under 11 U.S.C. § 1325(b)(3), his applicable commitment period was determined to be three years, and he limited his commitment period accordingly in the Plan.

2

The Creditors contend that CMI was miscalculated because two of its components are incorrect. Properly calculated, they contend, the Debtor's CMI would exceed the median annual income for a family of two in Massachusetts and, under § 1325(b)(4)(B), require a commitment period of five years. Specifically, the Creditors contend that: (i) the Debtor's actual income from the payment of expenses by R.C. Havens and JB Solutions in the six months before the petition date was not $1,482.15 per month but at least $6,833.33, or $41,000 over the six-month period; and (ii) Debtor's spouse's income during the 6-month period should have included, but did not, some $3,550 per month that she was receiving during that period as repayment of principal on a loan, because, the Creditors argue, repayment of a loan is income.  I will address each in turn.

(a)  **Income from Payment of Expenses**

First, the evidence establishes that from February through July, 2016, R.C. Havens paid expenses of the Debtor totaling at least $20,925.65, as in the chart that follows.

| Payee | Purpose | Amount | |
|---|---|---|---|
| National Grand Bank | HELOC | | $ 1,500.00 |
| National Grand Bank | HELOC | $ 1,500.00 | |
| National Grand Bank | HELOC | $ 2,848.58 | |
| National Grand Bank | HELOC | $ 1,445.00 | |
| Vermont Mutual Ins. | Homeowner's insurance | | $ 510.40 |
| Rita Havens (debtor's mother) | Expenses for family cabin | $ 1,000.00 | |
| IRS | Personal income taxes | $ 3,500.00 | |
| DOR | Personal income taxes | $ 905.00 | |
| Amy Renz (Debtor's spouse) | Personal | $ 2,290.00 | |
| Dentist | Medical care | $ 212.00 | |
| Dentist | Medical care | $ 600.00 | |
| Dentist | Medical care | $ 1,166.40 | |
| Air Canada | Personal travel | $ 1,578.76 | |
| QI Veterinary Clinic | Veterinary care | $ 566.00 | |
| Hawthorne Animal Health | Veterinary care | $ 1,122.22 | |
| Mass Vet. Referral Hospital | Veterinary care | $ 181.29 | |
| | TOTAL | $ 20,925.65 | |

In arriving at this figure I have included amounts paid on the Debtor's home equity line of credit, a personal obligation.  The Debtor suggested, but wasn't sure, that this might have been a business

3

expense in the nature of rent for office space that R.C. Havens used in the Debtor's house. This argument is not credible and is unavailing. It is not credible because he would know (but didn't) if his corporation (of which he is the sole owner and officer) were paying rent to him and his wife personally for space in their house. It is unavailing because rent is still income, just another form of it; dollar for dollar it would still add to his CMI. In arriving at this figure, I have not included utility payments because, when asked at trial, the Debtor could not be sure whether particular utility payments were for his home and not a home on which R.C. Havens was doing construction work. His testimony makes clear however that among the many utility payments in the R.C. Havens ledger in the relevant period, at least some were for his own home and should be added to the list above.

The sum of $20,925.65 is not exhaustive; it represents a tally of only the larger items, items the Creditors highlighted at trial. It clearly omits some utility payments that should be included. It is also clear that, through payment of credit card bills, if not also by other checks reflected on its ledger, R.C. Havens also paid many other personal expenses of the Debtor in the relevant six-month period: among other things, Netflix, a gym membership, liquor, expenses of travel in Canada, groceries, and restaurants. However, as the above total puts the Debtor's CMI well above the median for a family the size of his in Massachusetts, an exhaustive tally is unnecessary to decide this particular basis of objection to the Plan.

The evidence further establishes that in June and July 2016, JB Solutions paid the Debtor, as compensation, at least $7,642.98. The Debtor admitted that JB Solutions paid to him $1,500 as salary and to third parties for his personal obligations the further sum of $7,642.98. This figure is not exhaustive, as it is clear that JB Solutions also, during these months, paid for further, but unquantified, credit card charges by the debtor for food, travel, liquor, dental care, and veterinary expenses. The Debtor contends that the amounts paid for his expenses to third parties were not income to him but advances on a loan to him by JB Solutions. I find that there was no such loan. A loan would have

4

entailed an obligation to repay and thus created a debt owing on the date of his bankruptcy filing, but the Debtor reported no such debt to JB Solutions on the schedules he filed under oath in his bankruptcy case. In addition, although there is evidence that there was talk among the Debtor, his accountant, and John and Stacey Barnes, the principals of JB Solutions, about creating such a loan arrangement, all agree that the loan was not memorialized in a writing, bore no interest, had no terms, and entailed no obligation to repay at a specific or identifiable time.  They would just all figure it out later, when the Debtor was back on his figurative feet.  Even the timing and amounts of the advances were wholly in the debtor's discretion.  An advance with no obligation to repay is not a loan.  Moreover, payments of this kind were the form in which he had received compensation from R.C. Havens.  I find that these payments (and like payments after the bankruptcy filing) were income, not advances on a loan.

The expenses paid by R.C Havens and JB Solutions for the Debtor in the six months before his bankruptcy filing total at least $28,568.63 [$20,925.65 from R.C. Havens plus $7,642.98 from JB Solutions], an average of $4,761.44 per month, not $1,482.15 as the Debtor indicated on his Form 122C.

### (b)  Whether Repayment of Principal to Spouse was Income

Second, I hold as a matter of law that, at least for purposes of 11 U.S.C. § 1325(b), money received as repayment of principal on a loan is not income to the lender, any more than would be the return of any borrowed or rented asset (a car, an apartment, a pressure cleaner) would constitute income to its lender/lessor.  The payment of interest or other finance charges for the use of the principal would be income, but repayment of the principal is not, regardless of the fact that it is available to pay household expenses.  Savings are also available to pay household expenses, but the concern of § 1325(b) of the Bankruptcy Code, and accordingly of Form 122C, is with income. There is no dispute of fact that the amount in issue is comprised wholly of principal.  I conclude that the amount specified by the Debtor as the net income from the operation of his wife's business, $5,668.09, requires no modification.

5

### (c) Conclusion as to Applicable Commitment Period

In view of the above findings and rulings as to income from payment of expenses, the Debtor's calculation of CMI was in error in that the amount reported for "amounts from any source which are regularly paid for household expenses of you or your dependents" was at least $28,568.63, an average of $4,761.44 per month, not $1,482.15, as the Debtor indicated on his Form 122C. With this adjustment, CMI increases to at least $7,913.63. Annualized, this amounts to $94,963.56, which exceeds the median income in Massachusetts for a family of two, $72,346. Under 11 U.S.C. § 1325(b)(4)(A)(ii)(II), the applicable commitment period is accordingly not less than five years. As the Plan is based on a commitment period of only three years, it cannot be confirmed.

### IV. Projected Disposable Income

The Creditors next object to confirmation of the Plan on the basis that it falls considerably short of devoting all the Debtor's projected disposable income to repayment of his debt through the Plan, as required by § 1325(b)(1)(B) when an unsecured creditor objects. The Court need not address this objection. Having already sustained the Creditors' objection as to the commitment period, the disposition of this objection cannot change the outcome. Nor is it clear that addressing this objection now would head off issues in a future iteration of the Plan. One consequence of the Court's having ruled that the Debtor's CMI exceeds the median income in Massachusetts for a family of two is that disposable income must be determined in accordance with § 1325(b)(3). It is not at all clear that the Debtor followed this requirement in calculating disposable income in this iteration.

### V. Best Interest of Creditors

The Creditors next fault the Plan on the basis that it does not satisfy § 1325(a)(4), the so-called best interest of creditors test. As a condition of plan confirmation, it requires that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor

6

were liquidated under chapter 7 of this title on such date[.]" 11 U.S.C. § 1325(a)(4). The Creditors contend that the estate has equity in three assets that would in total provide for a distribution of some $142,000 in a chapter 7 liquidation, well in excess of what the Debtor would pay through the Plan. I proceed to address this objection because it would likely have bearing on future iterations of the Plan.

I begin with the Debtor's residence, the Walnut Street property. On the basis of the appraisal they commissioned, the Creditors state that its fair market value is $1,175,000, concede that it is subject to mortgages whose balances on the petition date totaled $570,134.62, concede that the equity is subject to a valid claim of exemption of $500,000, and contend that the remaining equity on the Debtor's one-half interest after satisfaction of these would result in $52,432.69 being available for distribution in a chapter 7 liquidation.

I need not make findings of fact about value. Even if the property had the value the Creditors would have me find, it would yield nothing for unsecured creditors in chapter 7. A sale price of $1,175,000 would first be reduced by a 6 percent broker's commission, $70,500, and the mortgage balances (which encumber both the Debtor's interest and his spouse's interest), leaving equity of $534,365.38. Assuming (in the best case scenario for the estate) that the exemption is paid next (and not after separation out of the spouse's equity), that would leave $34,365.38, and, after payment to the Debtor's spouse of her half interest, just $17,182.69. But that amount would still have to fund the legal cost of sale, including the sale motion, which Renz would oppose, and the cost of prosecuting what would be a contested complaint under § 363(h) for authority to sell, with the estate's interest in the property, the interest of his spouse. These, the trustee's commission, and other usual legal and accounting costs would surely consume any remaining value before a cent of it could reach unsecured creditors. The residence would hold no value for unsecured creditors in chapter 7.

The Creditors turn next to the Debtor's one-third interest as a tenant in common in the real property at 29 Bennett Street.  The Creditors contend that the property's value is $505,000[1] and that it is subject to a mortgage whose balance on the petition date was $324,530.  Again, a sale at the Creditors' valuation would have to pay first the broker's 6% fee, or $30,300, and the mortgage, leaving total equity of $150,170, and it is undisputed that the Debtor's interest in the property is at best one-third, so the estate's share would be $50,056.67.  Here, too, the trustee would need to prosecute a strongly-contested § 363(h) complaint in order to sell with the estate's interest, the interests of the other tenants in common.  This too would be costly, and with the Trustee's commission, accountants fees, legal fees and other expenses of administration would, if lucky and successful, leave maybe $15,000 or $20,000 to unsecured creditors, less than the debtor now proposes to devote to creditors of this rank.

I find that a trustee would not likely be successful under § 363(h) in obtaining authority to sell, with the Debtor's interest, the interests of the two other tenants in common.  The testimony of the Debtor and the co-owners is credible in that (i) none of the three intended or believed that in the transaction in which the co-owners acquired the property, the debtor would be deeded a one-third (or any) interest in the property, (ii) that all mortgage payments, taxes, utilities, and upkeep of the property since their acquisition of it have been funded exclusively by the other tenants in common, not at all by the Debtor, and (iii) that the Debtor has never in any way used or benefited from the property. In addition to prevailing under § 363(h), the co-owners would likely file and interpose a Massachusetts declaration of homestead, perhaps also a complaint to reform title, and most likely a complaint to determine that the Debtor's fractional interest is less than one third, or that they should recover from his interest amounts that they have funded to preserve and create the Debtor's portion of the properties' equity.  All of this would present, if not necessarily insuperable legal obstacles—I don't know

---

[1] I accept this valuation for purposes of argument but make no finding as to value.

8

how these would play out—at least more legal cost and uncertainty. In sum, I conclude that this property would not likely generate any recovery in chapter 7; and in any event, not more than does the Plan for creditors of the objecting Creditors' priority.

The Creditors' third source of funds for distribution in a hypothetical chapter 7 distribution would be a fraudulent transfer recovery. They maintain that the Debtor transferred some $34,500 to JB Solutions less than two months before his bankruptcy filing, when he was insolvent and for no reasonably equivalent value, to place the funds beyond the reach of creditors. I find that this would not be a likely source of recovery. First, the complaint would likely cost the trustee as much to prosecute as he or should could hope to recover.[2] Second, the source and real transferor of the assets was R.C. Havens; the Debtor only held them for a short time, to facilitate the transfer; and a Court would be obligated to review the transfer as a whole. Third, whether the transferee was R.C. Havens or the Debtor, it is clear from the evidence that they received reasonably equivalent value in return. JB Solutions used the funds to pay obligations of R.C. Havens that were necessary for the completion of four jobs that R.C. Havens was then working on. But for this transfer, the monies would have been seized by the Creditors, and this in turn would have crippled R.C. Havens in its ability to complete the four jobs, exposing both R.C. Havens, and the Debtor, to much more litigation and debt than it already faced. Instead, JB Solutions was able to complete the jobs successfully and pay R.C. Havens' subcontractors. I see no value for a chapter 7 estate in pursuing a fraudulent transfer action.

In sum, a distribution under chapter 7 case would likely result in no distribution to unsecured creditors. I conclude that the Plan satisfies § 1325(a)(4).

---

[2] The Creditors do not contend that, but for this transfer, R.C. Havens would have been solvent, such that the Debtor's 100 percent equity interest in that entity would have had value to his creditors and his bankruptcy estate.

9

VI.     Good Faith Under § 1325(a)(7)

The Creditors last oppose confirmation of this plan—and of any plan that the Debtor might file in this chapter 13 case—on the basis that he cannot satisfy § 1325(a)(7).  Subsection (a)(7) requires, as a condition of confirmation of a chapter 13 plan, that "the action of the debtor in filing the petition was in good faith."  Another condition of confirmation is that "the plan has been proposed in good faith," see § 1325(a)(3), so the Court is being asked here to evaluate the debtor's good or bad faith not in the filing of this plan but in the seeking of bankruptcy relief under Chapter 13 at all.   There is no governing law on what constitutes good faith in this circuit, and courts generally employ a totality of the circumstances test.  The Bankruptcy Appellate Panel for this circuit has observed that courts "generally consider the following factors": "(1) debtor's accuracy in stating her debts and expenses, (2) debtor's honesty in the bankruptcy process, including whether she has attempted to mislead the court and whether she has made any misrepresentations, (3) whether the Bankruptcy Code is being unfairly manipulated, (4) the type of debt sought to be discharged, (5) whether the debt would be dischargeable in a Chapter 7, and (6) debtor's motivation and sincerity in seeking Chapter 13 relief." *In re Sullivan*, 326 B.R. 204, 212 (B.A.P. 1st Cir. 2005).

The gravamen of the Creditors' good faith objection is that he has been dishonest and attempted to mislead the court about two things:  his interest in JB Solutions, LLC, and the income he has received from that entity.

On the evidence, I find no dishonesty about his relationship to JB Solutions.  He is employed by that entity, and he has no equity interest in it.  He does indeed, as the Creditors maintain, have a great deal of discretion and latitude in managing those of its affairs that constitute its general contracting business.  He was hired to do precisely that for JB Solutions.  It was indeed his idea; JB Solutions had not done this kind of work until the Debtor proposed that he do this work for JB Solutions; and the fact that JB Solutions' principals are his kin certainly factored into their decision to permit him to operate a

10

general contracting business out of their LLC. Still, on the evidence presented, that appears to be the true arrangement. I find no dishonesty here, either with the Court or the Creditors.

The allegation of dishonesty as to his income hits closer to the mark. The precise allegation is that the Debtor has misrepresented the extent of his income from JB Solutions by characterizing the lion's share of his compensation, received in the form of payments to third parties on his behalf, as "loans" or "advances" and consequently not income. I found and ruled above that these advances are not true loans but in fact income. This kind of misrepresentation, both as to his prepetition compensation in his completion of Form 122C and as to the calculation of his post-petition disposable income in his schedule of income, appears to be, and I find to be, a deliberate attempt to understate the disposable income he can and must devote to whatever plan he files. These misrepresentations follow upon a massive undercounting of his income of this nature from R.C. Havens in the six-month lookback in Form 122C. I find nowhere in the record where he explains or offers an excuse of any kind for this massive miscounting, and I further find that the misrepresentation in Form 122C was of considerable consequence for the duration of his plan and the manner in which disposable income is calculated. I can only conclude that the misrepresentations of income of which the Creditors complain were bad faith.

Still, they were bad faith in the filing and defense of a plan, *this* plan. The Plan therefore does not satisfy the good faith requirement *in § 1325(a)(3)*.

The misrepresentations do not affect other plans. Nor do they undercut the Debtor's good faith in filing his chapter 13 petition. The Debtor is in fact insolvent; he faces a large judgment debt that, outside of bankruptcy, would be highly disruptive and probably result in little benefit to the Creditors. In chapter 13 he can afford to make significant repayment of it over five years through a chapter 13 plan while containing or minimizing the disruption to his life and affairs and the businesses and individuals connected to it (spouse, family, clients, subcontractors, creditors). This is a debt profile for which chapter 13 is designed. There is no abuse or bad faith in his invoking chapter 13 relief in these

11

circumstances. Accordingly, at this juncture I do not find bad faith of the subsection (a)(7) variety. I do expect, however, that any amended plan will be based on a scrupulous and verifiable accounting of the Debtor's income.

### VII. Conclusion

For the reasons stated above, the Court will sustain the Creditors' objection to confirmation and set a deadline for the filing of an amended plan.

Date: October 1, 2018

_____
Frank J. Bailey
United States Bankruptcy Judge